## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| **DAVID KIM**, individually and on behalf of all others similarly situated, | : : : | Case No. 2:18-cv-11480-MCA-CLW |
| Plaintiff | : : | |
| v. | : : | |
| **NUTRABIO LABS, INC.**, | : : | **AMENDED CLASS ACTION COMPLAINT** |
| Defendant. | : : : | DEMAND FOR JURY TRIAL |

### INTRODUCTION

This is a consumer class action brought on behalf of consumers who purchased glutamine products, including Glutamine, L-Glutamine, Glutamine AKG, Extreme Nitric Stack, CGT-Max Powder, and Reload V5 dietary supplements ("the Product(s)"), from Nutrabio Labs, Inc. ("Defendant" or "Nutrabio"). Nutrabio engaged in unfair and/or deceptive business practices by misrepresenting the nature, characteristics, attributes, benefits and quality of the Products on the Products' labels and was unjustly enriched.

### NATURE OF THE CASE

1.      Plaintiff, David Kim ("Plaintiff" or "Kim"), brings this class action individually and on behalf of the Class (defined below) against Defendant to obtain relief, including, among other things, damages.  Plaintiff seeks redress for Defendant's manufacturing, marketing, promotion, distribution and sale of its glutamine Products packaged and advertised as "Supports Muscle Growth," "Speeds Muscle Recovery," "L-Glutamine has powerful muscle building effects, promoting protein synthesis and inhibiting protein breakdown," "Muscle Recovery Accelerator," "Clinically Dosed," and "Strength and Growth Matrix."

1

2.      Defendant advertises, manufactures, markets, sells and distributes the Products throughout the United States, including in the State of New Jersey and Commonwealth of Massachusetts.

3.      Defendant, like many companies in the bodybuilding supplement industry, ignores competent and reliable scientific data regarding its Products and ingredients and promotes, markets and represents the Products as providing benefits or enhancements which they cannot provide or deliver such as the representations made by Defendant about L-Glutamine in its Products as described throughout this Amended Complaint ("Complaint").

4.      L-Glutamine ("L-Glutamine" and "Glutamine" as used herein are synonymous) is the most abundant free amino acid found in the human blood, and one of the individual building blocks that join together to make up proteins in the body.  Glutamine is made in the muscles and then distributed to various organs in the body via the bloodstream.

5.      Glutamine is considered "nonessential" because the human body produces its own.

6.      While Glutamine naturally found within the body plays a role in certain mechanisms supporting muscle growth, recovery and immunity support, numerous scientific studies have proven that use of Glutamine supplements provides no additional benefits to the body.

7.      Many healthy people, however, are under the impression, perpetuated by dietary supplement manufacturers like Defendant, that a supplemental intake of Glutamine has beneficial effects.  This is frequently the case among athletes and bodybuilders, who commonly consume Glutamine multiple times a day.

8. Glutamine supplementation doses range from 2 to 40 grams per day, which represents 3% to 60% of the recommended intake of amino nitrogen.

9. Basically, the ingestion of Defendant's Products does absolutely nothing for the recovery from exercise, recovery of muscle tissue, increase in muscle growth or ability to decrease muscle wasting (anti-catabolic).

10. Defendant intended for consumers to read and rely on the representations on the labels of its Products and belief that the ingestion of its Products would provide health benefits such as muscle recovery, muscle growth, increased strength and anti-catabolic properties to induce them to purchase the Products.

11. Defendant is aware that these Products and its claims about these Products are patently false and provide no added benefits to consumers.

12. Plaintiff and Class members relied on Defendant's representations and purchased the Products, and, as a result of Defendant's failure to properly market and advertise its Products, Plaintiff has suffered damages and ascertainable loss.

## PARTIES

13. Plaintiff is a citizen of the Commonwealth of Massachusetts. At all times relevant to this matter, he resided in Newton, Massachusetts. In November 2017, after reading the purported claims on Defendant's Glutamine labeling, and in reliance on Defendant's promises of providing "Anti-catabolic," "Muscle Growth," and "Muscle Recovery" benefits, Plaintiff purchased the NutraBio Pure Glutamine Product for his own use from the website, www.gnc.com. Following his purchase, Plaintiff ingested the Product, using the recommended dosage instructions found on the back of the bottle.

3

14.     Defendant is a New Jersey corporation headquartered at 564 Lincoln Boulevard, Middlesex, New Jersey 08846.  Defendant's conduct that gives rise to the causes of action set forth herein takes place in, and emanates from, New Jersey.

## FACTUAL ALLEGATIONS

15.     Defendant's Products' labels clearly state that the Products provide the same claimed benefits, such as anti-catabolic effects, muscle recovery, and muscle growth:[1]



---

[1] Nutrabio Glutamine Product label states: "L-Glutamine has powerful muscle building effects, promoting protein synthesis while inhibiting protein breakdown," "Supports Muscle Growth," "Speeds Muscle Recovery," "Recovery" and "Strength."

Nutrabio GAKG Product label states, "Supports Muscle Growth," "Speeds Muscle Recovery," "Prevents Muscle Breakdown," "Recovery" and "Strength."

Nutrabio Extreme Nitric Stack Product label states, "Maximizes Protein Synthesis" and "Speeds Muscle Recovery".

Nutrabio CGT Max Product label states, "Speeds Muscle Recovery" and "Recovery."

Nutrabio Reload Reovery Matrix product label states, "Clinically Dosed," "Accelerate Muscle Recovery," "Maximize Muscle Growth," "Muscle Recovery Accelerator" and "Strength & Growth Matrix."









16.     Defendant's recovery, muscle, and anti-catabolic claims pertaining to the Glutamine in its Products, however, are patently false as demonstrated by the numerous scientific research papers, as referenced herein.

17.     "Recovery" in bodybuilding is the process in which fatigued muscles recuperate and grow after resistance training.

18.     "Anti-catabolic" refers to the ability of a product to prevent or minimize the breakdown of earned muscles during a workout.

19.     In one study, glutamine failed to affect muscle protein kinetics of the test subjects.[2]

20.     In a study involving healthy humans, glutamine was continuously infused for 2.5 hours at a rate corresponding to 0.4 grams/kg, which revealed that glutamine supplementation did not stimulate muscle protein synthesis.[3]

---

[2] Gore D., Wolfe R. *Glutamine supplementation fails to affect muscle protein kinetics in critically ill patients*. JPEN J Parenter Enteral Nutr, 2002, 26:342-49.

[3] Svanberg E., Moller-Loswick A., Matthews D., Korner U., Lundholm K. *The effect of Glutamine on protein balance and amino acid flux across arm and leg tissues in healthy volunteers*. Clin Physiol, 2001, 4:478-89.

21.     Another study investigated the effect of L-Glutamine supplementation on the plasma and muscle tissue Glutamine concentrations of exercise-trained rats, both immediately and three hours after a single exercise session until exhaustion.  In that study, rats were subjected to 60 minutes of swimming exercise daily for six weeks.  During the final three weeks, one group was given a daily dose of L-Glutamine (1 gram/kg). The plasma and muscle Glutamine levels were higher than placebo during the post-exhaustive recovery period; however, this increase had no effect on the exercise swim test to exhaustion performance, which means that elevations in plasma and muscle Glutamine levels have no benefit on muscle performance.[4]

22.     An additional study was also conducted to assess the effect of oral Glutamine supplementation combined with resistance training in young adults.  Subjects received either placebo (0.9 grams/kg fat-free mass/day of Maltodextrin) or L-Glutamine (0.9 grams/kg fat-free mass/day) during six weeks of resistance training. Results showed that muscle strength, torque, fat-free mass, and urinary 3-methyl histidine (a marker of muscle protein degradation) all significantly increased with training, but were not different between the groups.  This study demonstrated that L-Glutamine supplementation during resistance training had no significant effect on muscle performance, body composition, or muscle protein degradation in young, healthy adults.[5]

23.     Moreover, a study was performed to examine the effects of a combination of effervescent Creatine, Ribose, and Glutamine on muscle strength, endurance, and body composition in resistance-trained men.  Subjects performed resistance training while ingesting

---

[4] Rogero M., Tirapequi J., Pedrose R., Castro I., Pires I. *Effect of Alanyl-Glutamine supplementation on plasma and tissue glutamine concentrations in rats submitted to exhaustive exercise*. Nutrition, 2006, 22:564-71.

[5] Candow D., Chilibeck P., Burke D, Davison K., Smith-Palmer T. *Effect of Glutamine supplementation combined with resistance training in young adults*. Eur J Appl Physiol, 2001, 86:142-49.

either a placebo or an experimental supplement (5 grams of Creatine, 3 grams of Glutamine, and 2 grams Ribose) for eight weeks.  Both groups significantly improved muscle strength, endurance, and fat-free mass, yet the groups were not significantly different from one another. Therefore, the experimental supplement, which included Glutamine, was no more effective than placebo in improving skeletal muscle adaptation to resistance training.[6]

24.    Another study sought to determine the effects of eight weeks of Creatine Monohydrate and Glutamine supplementation on body composition and performance measures. Subjects were randomly assigned to receive either a placebo for eight weeks, Creatine Monohydrate (0.3 grams/kg/day for one week and then 0.03 grams/kg/day for seven weeks), or the same dose of creatine in addition to 4 grams of Glutamine per day while engaged in a resistance training program. Body mass and fat-free mass increased in the Creatine and Creatine + Glutamine groups at a greater rate than with placebo.  Additionally, the two experimental groups underwent a significantly greater improvement in the initial rate of muscle power production compared with a placebo.  These results suggest that the Creatine and Creatine + Glutamine groups were equally effective in producing skeletal adaptation to resistance training and that Glutamine apparently had no preferential effect in augmenting the results.[7]

25.    One study was performed to determine if high-dose Glutamine ingestion affected weightlifting performance.  In a double-blind, placebo-controlled, crossover study, resistance trained men performed weightlifting exercises one hour after ingesting a placebo (calorie-free

---

[6] Falk D., Heelan K., Thyfault J., Koch A. *Effects of effervescent Creatine, Ribose, and Glutamine supplementation on muscle strength, muscular endurance, and body composition*. J Strength Cond Res, 2003, 17:810-16.

[7] Lehmkuhl M., Malone M., Justice B., Trone G., Pistilli E., Vinci D., Haff E., Kilgore L., Haff G. *The effects of 8 weeks of Creatine Monohydrate and Glutamine supplementation on body composition and performance measures*. J Strength Cond Res, 2003, 17:425-38.

fruit juice) or Glutamine (0.3 g/kg) mixed with calorie-free fruit juice.  Results demonstrated no significant differences in weightlifting performance (maximal repetitions on the bench press and leg press exercises), indicating that the short-term ingestion of Glutamine did not enhance weightlifting performance in resistance-trained men.[8]

26.     Similarly, another study sought to determine whether Glutamine ingestion influenced acid-base balance or improved high-intensity exercise performance.  Trained males performed five exercise bouts on a cycle ergometer at 100% of maximal oxygen consumption. The first four bouts were 60 seconds in duration, while the fifth bout was continued to fatigue. Each bout was separated by 60 seconds of recovery.  The exercise bouts were initiated 90 minutes after ingesting either a placebo or 0.3 grams/kg of Glutamine.  Results showed that blood pH, bicarbonate, and lactate, along with time to fatigue, were not significantly different between supplement conditions, indicating that the acute ingestion of L-Glutamine did not enhance either buffering potential or high-intensity exercise performance in trained males.[9]

27.     Another study determined whether oral Glutamine, by itself or in combination with Hyperoxia, influenced oxidative metabolism or cycle time-trial performance in men. Subjects ingested either a placebo or 0.125 grams/kg of Glutamine one hour before completing a brief, high-intensity time-trial (approximately four minutes in duration).  The results showed no significant difference in pulmonary oxygen uptake during the exercise test, thereby indicating no effect of Glutamine ingestion, either alone or in combination with Hyperoxia.  Thus, there was

---

[8] Antonio J., Sanders M, Kalman D., Woodgate D., Street C. *The effects of high-dose Glutamine ingestion on weightlifting performance*. J Strength Cond Res, 2002, 16:157-60.

[9] Haub M., Potteiger J., Nau K., Webster M., Zebas C. *Acute L-Glutamine ingestion does not improve maximal effort exercise*. J Sports Med Phys Fitness, 1998, 38:240-44.

no limiting effect of the tricarboxylic acid intermediate pool size on oxidative metabolism or performance during exercise.[10]

28.     Nutrabio makes further false and/or misleading representations and statements on the Reload V5 Product label by stating that the Product is "Clinically Dosed."  Aside from the L-Glutamine ingredient contained within the Product's "Muscle Recovery Accelerator" matrix, the Product contains Beta-Alanine, Betaine, Creatine Hydrochloride and Creatine Magnapower in its "Strength and Growth Matrix."  None of these ingredients are "Clinically Dosed" to satisfy the claim of providing "strength" and "growth" attributed to the consumer.

29.     Beta-Alanine: The patented beta-alanine product, CarnoSyn, that Nutrabio includes in the Product lists the supported claims and the scientific studies that are purported to support those claims on its website, www.carnosyn.com.  First, one study claims that CarnoSyn increases the working capacity of muscle.[11]  However, the study was conducted with not only CarnoSyn, but in conjunction with Creatine Monohydrate.  Also, the participants ingested 1.6 grams of CarnoSyn four times a day for the first six days and two times a day for the remaining twenty-two days.  This dosing protocol is greater than the Product's dosing of 1.6 grams per serving. Second, another study claims that CarnoSyn increases muscle strength.[12]  The study participants were given a dosing protocol of 1.6 grams twice daily, again a higher dose than the

---

[10] Marwood S., Botwell J. *No effect of Glutamine supplementation and hyperoxia on oxidative metabolism and performance during high-intensity exercise*. J Sports Sci, 2008, 26:1081-90.

[11] Stout JR, et al., 2006. *Effects of twenty-eight days of beta-alanine and creatine monohydrate supplementation on the physical working capacity at the neuromuscular fatigue threshold.* J Strngth & Cond. Rsrch, 20(4): 928-931.

[12] Hoffman J, *et al.*, 2006. *Effect of creatine and beta-alanine supplementation on performance and endocrine responses in strength/power athletes.* Int J Sport Nutr & Exer Metab., 16: 430-446.

Product.  Third, another study claims that CarnoSyn improves muscular endurance.[13]  This dosing protocol was also higher than 1.6 grams per day where the participants used 6 grams per day for the first 21 days and 3 grams per day for the remaining 21 days.  Also, a study that gave participants 4.8 grams per day of Beta-Alanine failed to improve 400-M sprint times.[14]  Further, there are no scientific studies that show this ingredient's efficacy using one dose per day, at the recommended level contained within the Product.

30.     Betaine: There are numerous studies that show a modest increase in power output after Betaine supplementation, but these dosing protocols were all at an increased level of 2.5 grams per day.[15,16]  There are also several studies that show at 2-2.5 grams per day of Betaine actually have no effect on power output.[17,18,19]

31.     Creatine Hydrochloride: This claim and dosage is based on the assumption that Creatine HCL produces the same results as Creatine Monohydrate at a much smaller dose

---

[13] Smith A E, *et al.*, 2009. *Effects of beta-alanine supplementation and high level intensity interval training on endurance performance and body composition in men—a double-blind trial.* J Int Soc Sports Nutr., 6: 5.

[14] Derave W, *et al.*, 2007. *beta-Alanine supplementation augments muscle carnosine content and attenuates fatigue during repeated isokinetic contraction bouts in trained sprinters.* J Appl Physiol 103(5):1736-43.

[15] Lee EC, *et al.* 2010. *Ergogenic effects of betaine supplementation on strength and power performance.* J Int Soc Sports Nutr. 7:27.

[16] Pryor JL, *et al.* 2012. *Effect of betaine supplementation on cycling sprint performance.* J Int Soc Sports Nutr 9(1):12.

[17] Trepanowski TF, *et al.* 2011. *The effects of chronic betaine supplementation on exercise performance, skeletal muscle oxygen saturation and associated biochemical parameters in resistance trained men.* J Int Soc Sports Nutr. Dec;25(12):3461-71.

[18] Hoffman JR, *et al.* 2011. *Effect of 15 days of betaine ingestion on concentric and eccentric force outputs during isokinetic exercise.* J Strength Cond Res. Aug;25(8):2235-41.

[19] Hoffman JR, *et al.* 2009. *Effect of betaine supplementation on power performance and fatigue.* J Int Soc Sports Nutr. Feb 27; 6:7.

("micro-dosing") because Creatine HCL is more water-soluble.  There is absolutely no scientific backing that Creatine HCL produces greater strength, endurance, and muscle growth.  In fact, the theory of micro-dosing is fatally flawed.  First, Defendant fails to realize that the bioavailability of Creatine is the key to the effectiveness of the compound, not the water-solubility. Bioavailability is determined by how much of the compound is absorbed into the blood and ultimately the muscles. Creatine Monohydrate has been found, in a number of studies, to be completely absorbed by the GI tract.[20]  It has also been demonstrated that conversion of Creatine to creatinine in the GI tract is negligible with respect to transit duration, suggesting that arterial bioavailability of CM is approximately 100%.[21]   Again, there is no scientific backing for the claims Defendant associates with Creatine HCL.

32.    Creatine MagnaPower: There are no studies available to support the claims of "strength" and "growth" with the dosage of 500 mg provided for in the Product, thus making the "Clinically Dosed" claim false yet again.

33.    Defendant intended to and did use claims of "Anti-catabolic" "Muscle Growth," "Muscle Recovery" and "Clinically Dosed" to mislead consumers into believing the Products provided such benefits to induce them into purchasing the Products.

---

[20] *See* Chantuin A. The fate of creatine when administered to man. *J Biochem*. 67:29-41, 1926. *See also* Deldicque L, Decombaz J, Foncea H, Vuichoud J Poortmans J, Francaux M. Kinetics of creatine ingested as a food ingredient. *Eur J Appl Physiol*. 102:133-43, 2008.

[21] *See* Deldicque L, Decombaz J, Foncea H, Vuichoud J Poortmans J, Francaux M. Kinetics of creatine ingested as a food ingredient. *Eur J Appl Physiol*. 102:133-43, 2008. *See also* Persky A, Muller M, Derendorf J, Grant M, Brazeau G, Hochhaus G. Single- and multiple-dose pharmokinectics of oral creatine. *J Clin Pharmacol*. 43:29-37, 2003.  *See also* Poortmans J, Auquier H, Renaut V, Durussel A, Saugy M, Brisson G. Effect of short-term creatine supplementation on renal responses in men. *Eur J Appl Physiol*. 76:566-67, 1997.  *See also* Schedel J, Tanaka H, Kiyonaga A, Shindo M, Schutz Y. Actue creatine ingestion in human: Consequences on serum creatine an creatinine concentrations. *Life Sciences*. 65:2463-70, 1999.

34.     Plaintiff reasonably believed these claims to mean Defendant's Products provided these benefits and purchased the Product based on these misrepresentations and/or omissions.

35.     Plaintiff and the Class members did not receive Products of the value Defendant promised those Products would have.  The lack of benefits provided to consumers by the Products fully diminishes the actual value of the Products, as they provided none of the represented benefits.

36.     Plaintiff and Class members were deprived of the benefit of their bargained-for exchanges, and they suffered damages and ascertainable loss in an amount to be determined at trial.

37.     Plaintiff and Class members would not have purchased Defendant's Products had they known they did not provide the health benefits claimed and advertised on the Products' label.

38.     Defendant's deceptive statements violate 21 U.S.C. § 343(a)(1), which deems food misbranded when the label contains a statement that is "false or misleading in any particular."

39.      The United States Food and Drug Administration promulgated regulations for compliance with the Federal Food, Drug, and Cosmetic Act (the "FDCA") and the Dietary Supplement Health and Education Act at 21 C.F.R. § 101, *et seq*. Defendant's Products are misbranded under 21 C.F.R. § 101, *et seq*.

40.     The introduction of misbranded food into interstate commerce is prohibited under the FDCA.

41.     Under New Jersey Law, "[n]o person shall distribute or sell, or manufacture for distribution or sale . . . any food, drug, cosmetic or device which . . . is adulterated or

misbranded." *See* N.J. Rev. Stat. § 24:5-1.  Products such as those at issue in this Complaint are "misbranded" if they are "false or misleading in any particular." *See* N.J. Rev. Stat. § 24:5-16.

42.     Further, New Jersey regulations require that all packaged food be labeled in compliance with applicable federal regulations contained in 21 C.F.R. Parts 1 (General Enforcement Regulations) and 101 (Food Labeling).  *See* N.J. Admin. Code § 8:21-1.2 ("[t]he general labeling requirements of 21 CFR 1.1, 1.3, 1.4, 1.20, 1.23, 1.24 are incorporated herein by reference") and 1.3 ("[t]he food labeling requirements of 21 CFR 101, 102, 104, and 105 are incorporated herein by reference").

43.     Likewise, under Massachusetts law, products such as the Products are "misbranded" if their "labeling is false or misleading in any particular" or does not contain certain information on its labeling.  *See* Mass. ALM GL Ch. 94 § 187.

44.     Massachusetts requires that all packaged food be labeled in compliance with applicable law, including all labeling requirements contained in 21 C.F.R. Part 101 - Food Labeling.  *See* 105 CMR 590.001; 105 CMR 590.004(B); Mass. Food Code § 3-201.11. Massachusetts does this "to safeguard public health and provide to consumers food that is safe, unadulterated, and honestly presented."  *See* 105 CMR 590.001; 105 CMR 590.002; Mass. Food Code § 3-101.11.  Massachusetts mandates that "[f]ood shall be safe, unadulterated, and, as specified under [FC] § 3-601.12, honestly presented."  *See* Mass. Food Code § 3-101.11; 105 CMR 590.001.  Massachusetts Food Code § 3-601.12 provides that "[f]ood shall be offered for human consumption in a way that does not mislead or misinform the consumer.  *See* Mass. Food Code § 3-601.12; 105 CMR 590.001.

45.     The introduction of misbranded food into interstate commerce is prohibited under the FDCA, New Jersey and Massachusetts law.

46.     Plaintiff and Class members would not have purchased the Products, or, at a minimum, would have not paid as much for the Products, had they known the truth about the mislabeled and falsely advertised Products.

## JURISDICTION AND VENUE

47.     This Court has subject matter jurisdiction over this class action pursuant to 28 U.S.C. § 1332(d).  The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which many of the Class members are citizens of states other than New Jersey, where Defendant maintains its principal place of business.

48.     This Court has personal jurisdiction over Defendant because it is a resident of this District.  Moreover, Defendant conducts substantial business in this District and intentionally and purposefully directed the Products into the stream of commerce, including the sale and distribution of the Products, within New Jersey and throughout the United States from its headquarters in this District.

49.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) and (c) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.  Venue is also proper under 18 U.S.C. § 1965(a) because Defendant transacts substantial business in this District.

## CLASS ACTION ALLEGATIONS

50.     Plaintiff brings this suit as a class action on behalf of himself and all other similarly situated customers pursuant to Fed. R. Civ. P. 23.  Plaintiff seeks to represent the following Class:

**Nationwide Class:**

All persons residing in the United States who purchased, not for resale, the Products.

15

51.     In the alternative, Plaintiff brings this action on behalf of the following state class (collectively, with the Nationwide Class, "Class" or "Classes"):

**<u>Massachusetts Class:</u>**

All persons residing in the State of Massachusetts who purchased, not for resale, the Products.

Excluded from the Class are Defendant, its officers and employees, affiliates and any entity in which Defendant has a controlling interest.  Also excluded are any Judge or Magistrate presiding over this or any related action and members of their families, as well as anyone claiming personal injury.

52.     The exact number of Class members is unknown, as such information is in the exclusive control of the Defendant.  Plaintiff, however, believes that the Class encompasses hundreds of thousands of individuals throughout the United States.  Therefore, the number of persons who are members of the Class described above are so numerous that joinder of all members in one action is impracticable.

53.     Questions of law and fact that are common to the entire Class predominate over individual questions because the actions of Defendant complained of herein were generally applicable to the entire Class:

54.     These legal and factual questions include, but are not limited to:

a.    Whether Defendant knew or should have known its claims and statements regarding the benefits of the Products were false and/or misleading;

b.    Whether Defendant intended to mislead and/or deceive Plaintiff and Class members about the true benefits of the Products;

c.    Whether Defendant breached its express warranty to Plaintiff and Class members;

16

d.  Whether the Products failed to perform in accordance with the reasonable expectations of ordinary consumers;

e.  Whether the Products fail to perform as advertised and warranted or expected by an ordinary consumer;

f.  Whether Defendant's conduct in marketing and selling the Products involved misrepresentations, intentional omissions, or was otherwise unfair and deceptive;

g.  Whether Defendant breached its implied warranties to Plaintiff and Class members;

h.  Whether Plaintiff and Class members suffered damages and ascertainable loss as a result of Defendant's misconduct as described herein, and, if so, the proper measure of that loss; and

i.  Whether Plaintiff and the Class are entitled to compensatory, exemplary and statutory damages, and the amount of such damages.

55.  Plaintiff's claims are typical of those of other Class members because Plaintiff and all Class members were injured by the same wrongful practices of the Defendant, as described in this Complaint.  Plaintiff's claims arise from the same practices and course of conduct that gives rise to the claims of all Class members, and are based on the same legal theories.

56.  Questions of law or fact common to the Class members predominate and a class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit, because individual litigation of the claims of all Class members is economically unfeasible and procedurally impracticable.  While the aggregate damages sustained by Class

members are likely to be in the millions of dollars, the individual damages incurred by each Class member resulting from Defendant's wrongful conduct are, as a general matter, too small to warrant the expense of individual suits.  The likelihood of individual Class members prosecuting separate individual claims is remote and, even if every Class member could afford individual litigation, the court system would be unduly burdened by individual litigation of such cases. Individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all parties and to the court system resulting from multiple trials on the same factual issues.  Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action, and certification of the Class is proper.

57.     Plaintiff has no interests that are contrary to or in conflict with those of the Class he seeks to represent, and he will vigorously represent the interests of the members of the Class. Furthermore, Plaintiff has retained Class counsel with significant experience in handling complex class actions, including dietary supplement class actions.

58.     Defendant has acted or refused to act on grounds generally applicable to all members of the Class.

## COUNT I
## VIOLATIONS OF THE NEW JERSEY CONSUMER FRAUD ACT
### (N.J.S.A. § 56:8-1, *et seq.*)
### On Behalf Of The Nationwide Class

59.     Plaintiff re-alleges and incorporates by reference the allegations contained in all preceding paragraphs as though fully set forth herein.

60.     Plaintiff and Defendant are "persons" within the meaning of the New Jersey Consumer Fraud Act ("CFA").

61.     Plaintiff and the members of the Class are "consumers" within the meaning of the CFA.

62.     At all relevant times material hereto, Defendant conducted trade and commerce in New Jersey and elsewhere within the meaning of the CFA.

63.     The CFA is, by its terms, a cumulative remedy, such that remedies under its provisions can be awarded in addition to those provided under separate statutory schemes.

64.     Defendant's practices violated the CFA for, *inter alia*, one or more of the following reasons:

    a.  Defendant represented to Plaintiff and the Class that the Products had approval or characteristics that they did not have;

    b.  Defendant represented to Plaintiff and the Class that the Products were of a particular standard, quality, or grade, when they were actually of another;

    c.  Defendant advertised to Plaintiff and the Class goods with the intent not to sell them as advertised;

    d.  Defendant engaged in other fraudulent or deceptive conduct, creating a likelihood of confusion or misunderstanding; and

    e.  Defendant represented that consumers' purchases of the Products conferred or involved rights that the transactions did not have or involve.

65.     Defendant consciously omitted to disclose material facts to Plaintiff and the Class with respect to the Products.

66.     Defendant intended that Plaintiff and Class members rely on its acts of concealment and omissions and misrepresentations, so that Plaintiff and the Class would purchase the Products.

67.     Had Defendant disclosed all material information regarding the Products to Plaintiff and the Class, they would not have purchased the Products, or would have paid less for the Products.

68.     The foregoing acts, omissions and practices proximately caused Plaintiff and the Class to suffer an ascertainable loss in the form of monetary damages, and they are entitled to recover such damages, together with appropriate penalties, including treble damages, attorneys' fees and costs of suit.

**COUNT II**
**BREACH OF EXPRESS WARRANTY**
**(N.J. Stat. Ann. § 12A:2-313)**
**On Behalf Of The Nationwide Class**

69.     Plaintiff re-alleges and incorporates by reference the allegations contained in all preceding paragraphs as though set forth fully herein.

70.     As an express warrantor, manufacturer and merchant, Defendant had certain obligations under N.J. Stat. Ann. § 12A:2-313 to conform the Products to the express warranties.

71.     Plaintiff, and each member of the Class, formed a contract with Defendant at the time Plaintiff and the other Class members purchased the Products.  The terms of the contract include the promises and affirmations of fact made by Defendant on the Products' packaging and through marketing and advertising, as described above.  This labeling, marketing and advertising constitute express warranties and became part of the basis of the bargain, and are part of the standardized contract between Plaintiff and the members of the Class, and Defendant.

72.     Defendant purports, through its advertising, labeling, marketing and packaging, to create an express warranty that the Products were (are are) effective at providing the benefits represented therein.

73.     Plaintiff and the Class members performed all conditions precedent to Defendant's liability under this contract when they purchased the Products.

74.     Defendant breached express warranties about the Products and their qualities because Defendant's statements about the Products were false and the Products do not conform to Defendant's affirmations and promises described above.  Plaintiff and the Class members would not have purchased the Products, or, at a minimum, would have paid less for the Products, had they known the true nature of the Products.

75.     Defendant received timely notice regarding the problems at issue in this litigation, by letter in March 2018 to which it failed to respond, and, notwithstanding such notice, has failed and refused to offer an effective remedy.

76.     As a result of Defendant's breach of warranty, Plaintiff and Class members have been damaged in the amount of the purchase price of the Products.

## COUNT III
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (N.J. Stat. Ann. § 12A:2-314)
### On Behalf Of the Nationwide Class

77.     Plaintiff re-alleges and incorporates by reference the allegations contained in all preceding paragraphs as though set forth fully herein.

78.     Defendant is and was, at all relevant times, a merchant with respect to the Products.

79.     A warranty that the Products were in merchantable quality and condition is implied by law pursuant to N.J. Stat. Ann. § 12A:2-314.

80.     Defendant impliedly warranted that the Products were of good and merchantable condition and quality – fit and safe for their ordinary intended use.

81.     The Products were defective at the time they left the possession of Defendant, as set forth above, and Defendant knew of this defect at the time these transactions occurred.  Thus, the Products, when sold and at all times thereafter, were not in merchantable condition or quality and are not fit for their ordinary, intended purpose.

82.     By virtue of the conduct described herein and throughout this Complaint, Defendant breached the implied warranty of merchantability.

83.     Plaintiff and Class members have been damaged as a direct and proximate result of Defendant's breach of the implied warranty.

84.     Plaintiff and members of the Class have used the Products in a manner consistent with their intended use and performed each and every duty required under the terms of the warranties, except as may have been excused or prevented by the conduct of Defendant or by operation of law in light of Defendant's conduct.

85.     Defendant received timely notice regarding the problems at issue in this litigation, including by letter in March 2018, to which it failed to respond, and, notwithstanding such notice, failed and refused to offer an effective remedy.

86.     As a direct and proximate result of Defendant's breach of implied warranties, Plaintiff and the Class suffered damages.

<u>**COUNT IV**</u>
<u>**UNTURE AND MISLEADING ADVERTISING UNDER**</u>
<u>**MASSACHUSETTS G.L. c. 266 §91**</u>
**(Alternatively, On behalf of the Massachusetts Class)**

87.     Plaintiff re-alleges and incorporates by reference the allegations contained in all preceding paragraphs as though set forth fully herein.

88.     Defendant's labeling, advertising, marketing, and promotion of the Products are untrue, deceptive and misleading, in violation of G.L., c. 266, §91.

89.     At all times relevant, Defendant knew or, upon reasonable investigation, could have ascertained that its labeling, advertising, marketing, and promotion of its Products was untrue, deceptive, and misleading.

90.     Defendant's untrue, deceptive, and misleading labeling, advertising, marketing, and promotion of the Products is continuing as of the present date.

91.     As a purchaser of the Products who was injured by Defendant's false and misleading advertising (in that Plaintiff and other Class members purchased products that did not conform to the representations made about them by Defendant as set forth above), Plaintiff is entitled to and does bring this class action to seek all available remedies under G.L. c. 266, §91.

92.     Plaintiff has suffered injury in fact as a result of Defendant's conduct because he purchased the Products.

**COUNT V**
**VIOLATION OF MASSACHUSETTS ALM GL Ch. 94 §§ 187 AND 190 AND 105 CMR 590.001, *ET SEQ*.**
**(Alternatively, On Behalf of the Massachusetts Class)**

93.     Plaintiff re-alleges and incorporates by reference the allegations contained in all preceding paragraphs as though set forth fully herein.

94.     All containers of the Products are misbranded.

95.     Massachusetts ALM GL Ch. 94 § 187 provides that: "Food shall be deemed to be misbranded: . . . If its labeling is false or misleading in any particular . . . If its container is so made, formed, colored or filled as to be misleading . . . If any word, statement or other information required by or under authority of this chapter to appear on the label or labeling is not prominently placed thereon with such conspicuousness, as compared with other words, statements, designs, or devices, in the labeling, and in such terms as to render it likely to be read and understood by the ordinary individual under customary conditions of purchase and use."

96.     Massachusetts requires that all packaged food be labeled in compliance with applicable law, including all labeling requirements contained in 21 C.F.R. Part 101 - Food Labeling.  *See* 105 CMR 590.001; 105 CMR 590.004(B); Mass. Food Code § 3-201.11.  Massachusetts does this "to safeguard public health and provide to consumers food that is safe, unadulterated, and honestly presented."  *See* 105 CMR 590.001; 105 CMR 590.002; Mass. Food Code § 3-101.11.  Massachusetts mandates that "[f]ood shall be safe, unadulterated, and, as specified under [FC] § 3-601.12, honestly presented."  *See* Mass. Food Code § 3-101.11; 105 CMR 590.001.  Massachusetts Food Code § 3-601.12 provides that "[f]ood shall be offered for human consumption in a way that does not mislead or misinform the consumer.  *See* Mass. Food Code § 3-601.12; 105 CMR 590.001.

97.     All labeling of the containers of the Products are false and misleading.

98.     All containers of the Products are made as to be misleading.

99.     All containers of the Products are misbranded.

100.     Massachusetts ALM GL Ch. 94 § 190 bars the manufacture, sale, delivery, or offer of delivery of misbranded food.

101.     Plaintiff and the Massachusetts Class purchased misbranded containers of the Products.

102.     Plaintiff and the Massachusetts Class members would not have purchased the Products had they been aware that they were misbranded.

103.     Plaintiff and the Massachusetts Class members were harmed as a result of the purchase of the Products and are entitled to damages, including the amounts spent on the Products, as well as punitive damages.

## COUNT VI
## BREACH OF EXPRESS WARRANTY
### (Alternatively, On Behalf of the Massachusetts Class)

104.   Plaintiff re-alleges and incorporates by reference the allegations contained in all preceding paragraphs as though set forth fully herein.

105.   Plaintiff and Class members formed a contract with Defendant at the time they purchased the Products.  The terms of the contract included the promises and affirmations of fact made by Defendant on the Products' packaging and through marketing and advertising, as described above.  This labeling, marketing and advertising constitutes express warranties and became part of the basis of the bargain, and is part of the standardized contract between Plaintiff and the members of the Class and Defendant.

106.   Defendant labeled, distributed, marketed, promoted, sold and otherwise released, into the stream of commerce, its Products as described herein, to consumers, including Plaintiff.

107.   Defendant breached its express warranties about the Products because Defendant's statements about the Products were false and the Products do not conform to Defendant's affirmations and promises described above.

108.   As a direct, foreseeable and proximate result of Defendant's breaches of express warranties, Plaintiff and Class members suffered economic losses when Plaintiff and Class members purchased the Products in reasonable reliance upon the express warranties.

109.   Plaintiff notified Defendant of this breach by mail in March of 2018, but Defendant failed to respond.

110.   As a result of Defendant's conduct, Plaintiff and members of the Class have been damaged.

## COUNT VII
## BREACH OF IMPLIED WARRANTY
### (Alternatively, On Behalf of the Massachusetts Class)

111.    Plaintiff re-alleges and incorporates by reference the allegations contained in all preceding paragraphs as though set forth fully herein.

112.    Plaintiff asserts this cause of action on behalf of himself and the Class members.

113.    The Products are goods and Defendant is a merchant with respect thereto, within the meaning of the Uniform Commercial Code, as adopted in Massachusetts.

114.    Defendant developed, manufactured, distributed, marketed, advertised, and/or sold the Products directly to or for the purpose of their eventual sale to end users for consumption.

115.    Defendant impliedly warranted to Plaintiff and Class members, prior to their purchase of the Products, that the Products were merchantable and reasonably fit for the purposes for which such products are used, and that the product be acceptable in trade for the product description.

116.    Plaintiff and Class members relied on Defendant's skill and judgment in selecting Defendant's Products to purchase.  Moreover, Plaintiff and Class members relied on statements made on Defendant's packaging, containers, and/or labels, that the Products provide benefits such as anti-catabolic effects, muscle recovery, and muscle growth.

117.    Defendant breached its duty by selling to Plaintiff and Class members Products that were not merchantable.  In fact, the Products are unfit for their intended use and not of merchantable quality, in that they do not provide anticatabolic, muscle recovery, and muscle growth benefits.

118.    The Products are unfit for their ordinary purpose and of nonmerchantable quality because they do not conform to the promises and/or affirmations of fact found on the Products' containers or labels.

119.    Defendant breached its implied warranties by including false promises or affirmations of fact on the Products' labels and/or containers.

120.    Plaintiff notified Defendant of this breach by mail in March of 2018, but Defendant failed to respond.

121.    As a result of Defendant's conduct, Plaintiff and members of the Class have been damaged.

## COUNT VIII
## VIOLATION OF MASSACHUSETTS ALM GL Ch. 93A *ET SEQ*.
### (Alternatively, On Behalf of the Massachusetts Class)

122.    Plaintiff re-alleges and incorporates by reference the allegations contained in all preceding paragraphs as though set forth fully herein.

123.    Defendant's conduct constitutes unfair methods of competition and unfair and deceptive acts and practices in the conduct of a trade or commerce.  Defendant's conduct was consumer-oriented and this conduct had a broad impact on consumers at large.  Defendant engaged in false, misleading, and unlawful advertising, marketing, and labeling of the Products. Defendant's manufacturing, distribution, and sale of the Products was similarly unlawful.

124.    Defendant unlawfully sold the Products in Massachusetts during the past four years.

125.    By advertising, marketing, distributing, and selling the mislabeled and misbranded Products to Plaintiff and other members of the Class who purchased the Products in Massachusetts, Defendant engaged in, and continues to engage in, unlawful and deceptive acts

and practices.  Defendant's misleading marketing, advertising, packaging, and labeling of the Products was (and is) likely to deceive reasonable consumers.

126.    Plaintiff and other members of the Class who purchased the Products in Massachusetts were deceived.

127.    Defendant has engaged in unlawful and deceptive business acts and practices.

128.    Defendant and other members of the Class who purchased the Products in Massachusetts were injured by Defendant's unlawful and deceptive acts and practices.  Plaintiff and other members of the Class who purchased the Products in Massachusetts were also injured by Defendant's use or employment of methods, acts, and practices declared to be unlawful by section two of Massachusetts ALM GL Ch. 93A and any rule or regulation issued thereunder. Defendant's use or employment of such unfair and deceptive acts and practices has caused similar injury to numerous other persons similarly situated who Plaintiff will adequately and fairly represent.

129.    Defendant's fraud and deception caused Plaintiff and other members of the Class to purchase the Products that they otherwise would not have purchased had they known the true nature of these Products.

130.    Plaintiff and other members of the Class who purchased the Products in Massachusetts were injured as a result of Defendant's unlawful and deceptive acts and practices.

131.    In violation of the labeling laws of the Commonwealth of Massachusetts and Massachusetts ALM GL ch. 93A, *et seq.*, Defendant sold to Plaintiff and the members of the Class who purchased the Product in Massachusetts, Products that were misbranded.

132.    Defendant's violation of Massachusetts ALM GL Ch. 93A *et seq.* is ongoing.

133.    As a direct and proximate cause of Defendant's violation of Massachusetts ALM GL Ch. 93A *et seq.*, Plaintiff and the members of the Class who purchased the Products in Massachusetts were injured when they paid good money for these misbranded Products. Plaintiff and the members of the Class who purchased the Products in Massachusetts have been damaged in an amount to be determined at trial.

134.    In addition, Plaintiff and the members of the Class who purchased the Products in Massachusetts are entitled to the greater of their actual damages and the statutory amount of $25.

135.    Pursuant to the requirements of M.G.L. 93A §2, at least 30 days prior to filing this Complaint, Plaintiff sent a Demand Letter to the Defendant describing the unfair practices alleged herein and the injury suffered by Plaintiff.  Defendant declined to make a satisfactory settlement offer in response thereto.

136.    Defendant failed to respond to this demand in any reasonable manner. Defendant continues to deny any wrongdoing and has refused to change its practices, to stop misbranding the Products and to cease manufacturing, advertising, selling, and delivering the misbranded Products in Massachusetts.

137.    Defendant's actions were knowing and willful and its failure to grant relief upon demand was made in bad faith, with knowledge or reason to know that the act or practice complained of violated said section two of Massachusetts ALM GL Ch. 93A.

138.    Because Defendant's violation of Massachusetts ALM GL Ch. 93A, *et seq.* was knowing and willful and Defendant's failure to grant relief upon demand was made in bad faith with knowledge or reason to know that the act or practice complained of violated said section two of Massachusetts ALM GL Ch. 93A, Plaintiff and the members of the Class who purchased

the Products in Massachusetts are entitled to recover not less than twice and not more than three times their actual damages and any applicable statutory penalties.

139.    Plaintiff and the members of the Class are also entitled to attorneys' fees and expenses.

## PRAYER FOR RELIEF

140.    WHEREFORE, Plaintiff prays that this case be certified and maintained as a class action and for a judgment to be entered upon Defendant as follows:

A.  Appointing Plaintiff as the representatives of the Class and his counsel as Class counsel;

B.  For economic and compensatory damages on behalf of Plaintiff and all Class members;

C.  For ascertainable loss and actual damages sustained;

D.  For treble damages pursuant to law, and all other actual, general, special, incidental, statutory, punitive, and consequential damages to which Plaintiff and Class members are entitled;

E.  For reasonable attorneys' fees, reimbursement of all costs for the prosecution of this action, and pre-judgment and post-judgment interest; and

F.  For such other and further relief this Court deems just and appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff respectfully demands a trial by jury on all issues within the instant so triable.

Dated: October 9, 2018

**SHEPHERD, FINKELMAN,
MILLER & SHAH, LLP**

By: */s/* James C. Shah
James C. Shah
475 White Horse Pike
Collingswood, NJ 08107
Telephone: (856) 858-1770
Email: jshah@sfmslaw.com

Michael Weinkowitz
Charles E. Schaffer
**LEVIN SEDRAN & BERMAN, LLP**
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Telephone: (215) 592-1500
Email: mweinkowitz@lfsblaw.com
    cschaffer@lfsblaw.com

Nick Suciu III
**BARBAT, MANSOUR & SUCIU PLLC**
1644 Bracken Road
Bloomfield Hills, MI 48302
Telephone: (313) 303-3472
Email: nicksuciu@bmslawyers.com

Charles J. LaDuca
Beatrice Yakubu
**CUNEO GILBERT & LADUCA, LLP**
4725 Wisconsin Avenue NW
Suite 200
Washington, D.C. 20016
Telephone: (202) 789-3960
Email: charles@cuneolaw.com
    byakubu@cuneolaw.com

Erica C. Mirabella
**MIRABELLA LAW, LLC**
132 Boylston Street, 5th Floor
Boston, MA 02116
Telephone: (617) 580-8270
Email: erica@mirabellaLLC.com

*Counsel for Plaintiff
and the Proposed Putative Classes*